

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-12-00524-CV

Vernard **GRICE**,
Appellant

v.

**ALAMO COMMUNITY COLLEGE DISTRICT**,
Appellee

From the 407th Judicial District Court, Bexar County, Texas
Trial Court No. 2010-CI-17062
Honorable Barbara Hanson Nellermoe, Judge Presiding

Opinion by:  Luz Elena D. Chapa, Justice

Sitting:  Catherine Stone, Chief Justice
Marialyn Barnard, Justice
Luz Elena D. Chapa, Justice

Delivered and Filed:  April 24, 2013

AFFIRMED

Vernard Grice appeals the trial court's summary judgment in favor of Alamo Community College District ("ACCD") on his claims for unlawful sex and race discrimination.  We affirm the judgment, holding Grice failed to present any evidence that he was treated less favorably than similarly situated females or non-African-Americans.

### BACKGROUND

Grice is an African-American male who began work at ACCD in 1996 as a Continuing Education Specialist.  By mid-2008, Grice was serving as both the Interim Director of

Partnerships and Extended Services at St. Philip's College and as the Interim Dean of Workforce Development and Continuing Education.[1] In his position as the Interim Director, Grice's responsibilities included interviewing, hiring, and supervising staff. As Interim Dean, Grice held an upper-level management position in which he supervised staff and was expected to provide direction and leadership.

When Grice was hired, he received and signed ACCD's sexual harassment policy. That policy contained a broad definition of sexual harassment and further stated, "Engaging in sexual conduct with students or other employees where there is a professional responsibility to the student or employee may lead to allegations of sexual harassment and is therefore discouraged." Grice received training on sexual harassment and ACCD's policies in 2002, 2007, and in February 2008. Dr. Adena Williams Loston, who became President of St. Philip's College in 2007, testified she made it clear to the staff from the time she started that she believed intimate relationships with students or other employees were inappropriate.

In September 2008, Grice's department was looking for an offsite evening monitor to work at several offsite locations. Grice asked the secretary to contact the temporary agency to find someone to work part-time temporarily until the position could be advertised and filled permanently. The temporary agency sent Ms. Cooper. During Ms. Cooper's first three months of work, she reported directly to Grice because the position of her direct supervisor was not filled. Within a month of Ms. Cooper starting work, Grice's relationship with her became personal and physical. Grice maintains the relationship was always consensual and there was never any express or implied coercion. They saw each other outside of work regularly until sometime in January 2009, and then less frequently until mid-April 2009. During this time,

---

[1] Grice became the permanent Director of Partnerships and Extended Services in June 2009, and remained Interim Dean until a permanent Dean was hired in August 2009.

Grice and Ms. Cooper exchanged numerous text messages, including at least one sexually explicit picture sent by Grice. Grice also admitted that at times third parties were involved in their sexual activities. Grice testified he gave Ms. Cooper money to repair her car, pay her cell phone and electric bills, and pay for gas. He paid her $100 to clean his house, and in April 2009, he gave her $200 to take her grandchildren to Fiesta. Although some outside parties were aware of the relationship, no one at ACCD was aware of it.

By January 2009, the position of Ms. Cooper's direct supervisor had been filled. Nevertheless, she remained under Grice's supervision, two or three levels below him in the chain of authority. In March 2009, Ms. Cooper was hired as a permanent part-time employee. Grice testified he was not directly involved in the hiring decision.

In February 2009, ACCD posted proposed new personnel policies for employee review and comment. The revised sexual harassment policy, D.4.5, contained minor changes in the definition of "sexual harassment," but remained essentially unchanged from the previous policy. However, the language "discouraging" consensual relationships was removed from the sexual harassment policy and was replaced by a separate, new policy entitled "Consensual Relationships." The new policy, D.4.12, expressly prohibited romantic or sexual relationships between employees and their subordinates or students "whether or not they result in sexual harassment." In April 2009, Dr. Loston told her staff at one of her weekly meetings that if any of them were engaged in such a relationship, it needed to stop before the policy went into effect. Grice testified he ended the relationship with Ms. Cooper because of Dr. Loston's warning. The new policies went into effect April 28, 2009.

Ms. Cooper filed a sexual harassment complaint against Grice in September 2009. The complaint alleged that while she was working through the temporary service, Grice, her supervisor, started calling her frequently and asking her out. She alleged he would become

angry if she declined. She stated Grice repeatedly told her he could get her hired as a permanent employee, but it would take time. She complained that Grice stalked her at nightclubs, made inappropriate sexual comments to her, sent sexually explicit text messages, called her at inappropriate hours, and at times sent her money for no apparent reason. Ms. Cooper stated Grice implied that she owed her job to him and required that she go to his house to get her timesheets signed. On one occasion, when she arrived at Grice's house, there was a naked woman in the house. Ms. Cooper alleged that Grice required her to watch them have oral sex.

ACCD assigned Ms. Cooper's complaint to a committee for investigation. The committee consisted of Rebecca Duran, a senior human resources generalist, and a male ACCD employee from a different campus. The committee interviewed Ms. Cooper, Grice, and witnesses they designated, and reviewed all materials they provided. Ms. Duran testified the committee did not interview anyone other than Ms. Cooper and Mr. Grice who was aware of the relationship. Thus the only corroboration of any of the details in the complaint came from Grice himself. Ms. Duran testified that Grice maintained the relationship was entirely consensual. He corroborated some of Ms. Cooper's factual allegations, but asserted she was a full and willing participant. Ms. Cooper contended the relationship was not consensual, and that Grice essentially forced himself on her.

The committee concluded that Grice had committed sexual harassment. The committee's report contained the following conclusions and recommendations:

> The committee considered Mr. Grice's claim that Ms. Cooper voluntarily participated in an intimate relationship with him. It was also considered that Ms. Cooper gained financially from this relationship and that she visited Mr. Grice's home even after he engaged in objectionable conduct. Nevertheless, Mr. Grice, in the Interim dean position, was in a position which could, or at minimum perceived to implicitly, influence Ms. Cooper's employment conditions. The positional power was highly skewed towards Mr. Grice and makes the voluntary nature of such a relationship questionable. As such, the committee determines that Mr. Grice exercised poor judgment in entering into an intimate relationship

> with a subordinate and that a portion of Ms. Cooper's complaints of harassment against Mr. Grice have been substantiated.
>
> For this reason, the committee views that Mr. Grice's behaviors, most notably (but not limited to) engaging in an intimate relationship with a subordinate and sharing sexually explicit texts, has been sufficiently severe to violate Alamo Colleges policy prohibiting sexual harassment. Given the seriousness of the behavior(s), Mr. Grice's level of authority and Mr. Grice's documented awareness of the policies which prohibit such behavior, the committee recommends that Mr. Grice is separated from employment with the Alamo Colleges.

The report and recommendation were forwarded to Ruth Dalrymple, St. Philip's College's Vice President of Academic Affairs, who accepted the recommendation, and Dr. Loston approved terminating Grice's employment. On October 22, 2009, Grice received a letter notifying him that his employment was terminated because he had violated ACCD sexual harassment policies D.4.5 and D.4.5.1.

Grice sued ACCD under the Texas Commission on Human Rights Act, alleging he was fired because of his race and gender. *See* TEX. LABOR CODE ANN. § 21.051 *et seq.* (West 2006). He pled the reason given for his firing—that he violated ACCD Sexual Harassment policies D.4.5 and D.4.5.1—was false and pretextual because those policies did not come into effect until April 28, 2009, after his relationship ended. Finally, Grice alleged the female employee was not fired and alleged at least one non-African-American male against whom a claim of sexual harassment was corroborated had not been fired.

After the close of discovery, ACCD filed a hybrid motion for summary judgment, asserting there was no evidence Grice was treated less favorably than similarly situated employees outside his class, ACCD had a legitimate, non-discriminatory reason for firing Grice, and Grice had no evidence that ACCD's rationale was a pretext for discrimination. The trial court granted ACCD's motion without stating its reasons and rendered a take-nothing judgment.

**DISCUSSION**

We review a summary judgment *de novo*. *Provident Life & Acc. Ins. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). We take as true all evidence favorable to the nonmovant and indulge all reasonable inferences and resolve any doubts in the nonmovant's favor. *Id.* When the trial court does not specify the grounds on which it granted summary judgment, we will affirm the judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Id.* at 216.

When the movant challenges the evidentiary support for an element of a claim under Texas Rule of Civil Procedure 166a(i), the burden is on the nonmovant to produce summary judgment evidence that raises a genuine issue of material fact on the challenged element. TEX. R. CIV. P. 166a(i); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). "A genuine issue of material fact exists if more than a scintilla of evidence establishing the existence of the challenged element is produced." *Id.* at 600. "[M]ore than a scintilla of evidence exists if the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Id.* at 601 (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). "On the other hand, '[w]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.'" *Ford*, 135 S.W.3d at 601 (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

When summary judgment is sought under Rule 166a(c), the movant must establish that there is no genuine issue of material fact and he is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison Co. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). A matter is conclusively established if reasonable people could not differ as to

the conclusion to be drawn from the evidence. *City of Keller v. Wilson*, 168 S.W.3d 802, 814 (Tex. 2005).

Under the Texas Commission on Human Rights Act, an employer may not discriminate against an employee based on "race, color, disability, religion, sex, national origin, or age." TEX. LAB. CODE ANN. § 21.051(1) (West 2006). The plaintiff has the burden to prove that a proscribed reason was a motivating factor in the employment decision. *Id.* § 21.125(a); *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008). In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case for violation of the Act by showing he was (1) a member of the class protected by the Act, (2) qualified for his employment position, (3) terminated by the employer, and (4) treated less favorably than similarly situated members of the opposing class. *AutoZone*, 272 S.W.3d at 592; *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).[2]

Once a prima facie case is established, the burden shifts to the defendant to clearly articulate a legitimate, non-discriminatory reason for the adverse employment action. *Reeves*, 530 U.S. at 142. In the context of summary judgment, the defendant must conclusively establish its legitimate, non-discriminatory reason for the employment action. *M.D. Anderson Hosp. & Tumor Institute v. Willrich*, 24 S.W.3d 22, 24 (Tex. 2000) (per curiam). The burden then shifts back to the plaintiff to show that the reasons offered were a pretext for discrimination. *Reeves*, 530 U.S. at 143; *Willrich*, 24 S.W.3d at 24. Pretext is shown with evidence "that the non-discriminatory reason given by the employer is false or not credible, and that the real reason for the employment action was unlawful discrimination." *Elgaghil v. Tarrant County Junior College*, 45 S.W.3d 133, 140 (Tex. App.—Fort Worth 2000, pet. denied).

---

[2] In adopting the Texas Commission on Human Rights Act, the Legislature "intended to correlate state law with federal law in employment discrimination cases." *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005). We may therefore look to federal law to interpret the Act. *Id.*; *AutoZone*, 272 S.W.3d at 592.

Grice first argues the trial court erred in granting summary judgment because he presented sufficient evidence to support a prima facie case of discrimination. ACCD conceded for the limited purpose of the summary judgment proceeding that Grice could establish the first three elements of his prima facie case (member of a protected class; qualified for his position; and terminated by the employer). However, it moved for summary judgment on the ground that there was no evidence Grice was treated less favorably than similarly situated females or non-African-American employees. In this context, "[e]mployees are similarly situated if their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct." *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917–18 (Tex. 2005). To be evidence of discrimination based on disparate discipline, "the disciplined and undisciplined employees' misconduct must be of 'comparable seriousness.'" *Auto Zone*, 272 S.W.3d at 594 (quoting *Monarrez*, 177 S.W.3d at 917). "The situations and conduct of the employees in question must be 'nearly identical.'" *Auto Zone*, 272 S.W.3d at 594 (quoting *Monarrez*, 177 S.W.3d at 917–18.) "Employees with different responsibilities, supervisors, capabilities, work rule violations, or disciplinary records are not considered to be 'nearly identical.'" *AutoZone*, 272 S.W.3d at 594.

Grice did not argue, either in his response to the motion for summary judgment or in his brief on appeal, that he was treated less favorably than similarly situated females. There is no summary judgment evidence concerning how any complaint of sexual harassment against a female employee of ACCD was handled. We therefore affirm the summary judgment in favor of ACCD on Grice's cause of action for gender discrimination.

Grice bases his argument that he was treated less favorably than similarly situated non-African-American males on the case of one Hispanic former staff member who was not fired after a sexual harassment claim was substantiated and on incomplete information about an

adjunct faculty member who allegedly had an affair with a student. Grice relies primarily on the case of Larry Y., a Hispanic male, against whom a claim of sexual harassment complaint was filed in 2006. Larry Y. was a Recruiter Advisor at St. Philip's College and was found to have committed sexual harassment against a co-worker. He did not have any supervisory authority over the complainant, nor did he make any hiring, firing, or promotion decisions or exercise direct authority over any subordinates. The investigative committee recommended Larry Y. be disciplined, but not terminated.

We agree with ACCD that Larry Y. was not situated similarly to Grice. Unlike Larry Y., Grice directly supervised the complainant he was found to have sexually harassed. Grice held an upper-level management position at the college and had responsibility for hiring and supervising subordinates. Larry Y. had no supervisory responsibilities. Moreover, as Interim Dean, Grice was expected to provide direction and leadership to other staff. These circumstances place Grice in a significantly different position than Larry Y.

Grice also relies on an incident he believes occurred in April 2009. According to Grice, at a staff meeting in April 2009, Dr. Loston related that she had just dealt with an altercation on campus between a faculty member and a student's husband. Dr. Loston testified at her deposition she recalled "dealing with" a situation around April 2009 that she believes involved a part-time adjunct faculty member and a student. She did not recall the faculty member's name, race, or ethnicity, but believed he had been hired only for the semester and did not return the following semester. Ruth Dalrymple testified she recalled asking ACCD's human resources department to investigate after a spouse made an inquiry about his wife, who was a student, and an adjunct professor. Dalrymple did not remember the time frame or outcome. Human Resource Generalist Rebecca Duran testified she was part of a team assigned to investigate a claim of sexual harassment arising out of an adjunct professor's relationship with a student. The

adjunct was not African-American. The committee recommended the adjunct's contract not be renewed for the following semester. However, Duran testified she did not recall a situation in which a student's spouse came to campus angry because the student was involved with a faculty member.

The incomplete information in the record about the adjunct professor Dr. Loston referred to in April 2009 does not support Grice's prima facie case. The record does not establish the adjunct's conduct or the findings of any investigation with any degree of certainty. Thus there is insufficient information to show the adjunct was similarly situated to Grice. Further, there is no evidence in the record that an adjunct professor found to have had a relationship with a student was allowed to remain employed at the college and therefore no evidence of more favorable treatment.

Grice did not present evidence of any non-African-American males, other than Larry Y., who were found to have committed sexual harassment at ACCD and who kept their jobs. Moreover, the record contains evidence of two other non-African-Americans who lost their jobs with ACCD after being accused of sexual harassment. Clifton N. was a Hispanic St. Philip's College professor against whom a staff member filed a complaint of sexual harassment. During the investigation, but before it was completed, Clifton N. submitted his resignation and signed an agreement that he would not seek re-employment with ACCD. Juan M., a Hispanic faculty or staff member with no prior disciplinary history, was also accused of sexual harassment. ACCD investigated the complaint and found Juan M. used the authority of his position to request sexual favors. ACCD fired Juan M.[3]

---

[3] At oral argument, Grice asserted his case should not be compared to Juan M.'s because he was on a different campus and the ultimate decision to terminate Juan M. was not made by Dr. Loston. Under this rationale, Larry Y. is also not a fair comparator because the sexual harassment complaint against Larry Y. occurred before Dr. Loston was employed by ACCD.

The record is devoid of evidence that ACCD has treated similarly situated non-African-American males more favorably than was Grice. We conclude Grice failed to produce evidence raising a genuine issue of material fact on one of the elements of his prima facie case of race discrimination. A plaintiff who fails to demonstrate the elements of a prima facie case "never gets the presumption of discrimination and never proves his claim." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 637 (Tex. 2012). The trial court therefore did not err in granting ACCD's motion for summary judgment, and we affirm the judgment of the trial court.[4]

Luz Elena D. Chapa, Justice

---

[4] Because of our disposition of this issue, we need not address whether ACCD established a legitimate, non-discriminatory reason for firing Grice or whether summary judgment was properly granted on the ground that Grice presented no evidence the reason was pretextual.